# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SPROUT RETAIL, INC., | ) | Civil Action No: |
| *Plaintiff*, | ) | 17-cv-00135 (PGS)(DEA) |
| v. | ) | **MEMORANDUM** |
| | ) | **&** |
| USCONNECT LLC, | ) | **ORDER FOR PRELIMINARY** |
| | ) | **INJUNCTION** |
| *Defendant*. | ) | |

This matter comes before the Court by Defendant USConnect, LLC's ("USConnect"), on behalf of its counsel, motion to dismiss Plaintiff Sprout Retail, Inc.'s ("Sprout") amended second-filed complaint (*see* Dkt. No. 8), and Sprout's, on behalf of its counsel, motion for preliminary injunction on order to show cause (*see* Dkt. No. 9). Oral arguments were heard on March 22, 2017.

USConnect asserts that this case ("Federal Action") should be dismissed because—(i) under the first-filed rule, the federal action is a duplicative action of a previously filed suit in the North Carolina State Court (the "NC Action") that takes precedence over the federal action; (ii) the Court should abstain jurisdiction over the federal action under the *Colorado River* abstention doctrine because claims in the federal action are compulsory counterclaims in the NC Action as they concern the same subject matter and the same parties; and (iii) this Court lacks personal jurisdiction over USConnect.

In opposition, Sprout asserts—(i) the first-filed rule does not apply in the federal action because the NC Action was filed in the state court and not in a district court; (ii) this Court should not abstain jurisdiction over the federal action under the *Colorado River* abstention doctrine

because there is no strong federal policy in place; and (iii) USConnect has the sufficient minimum contacts with the State of New Jersey for it to have reasonably anticipated being haled into court in this jurisdiction.

With regards to Sprout's preliminary injunction motion, Sprout asserts that USConnect has misappropriated and misused its trade secrets such as—(i) pre-coded payment cards, (ii) Sprout's APIs, application program interfaces, and related payment protocols, and (iii) Sprout's software and system. And, Sprout further request this Court to issue a preliminary injunction on all later developed technologies by USConnect under the Ownership of Technical Developments section of the Service Agreement.

In opposition, USConnect argues that a preliminary injunction should not be issued because—(i) it had a valid license to the aforementioned trade secrets under the Service Agreement, (ii) it's current system is substantially different from the Sprout APIs because it is using its own system and no longer using the Sprout System, and (iii) it has issued new cards that are different from the pre-coded payment cards issued through the Heartland Payment Systems under the Service Agreement.

## BACKGROUND

USConnect is a technology service provider for the vending and food service industries based in Greensboro, North Carolina. As a technology service provider, USConnect connects numerous different affiliates across the nation by providing them with a cashless payment system. The affiliates include individuals or businesses who operate vending machines, micro markets, unmanned kiosks, cafeteria cash registers, and other remote food service devices. The cashless payment system includes mobile telemetry and loyal card programs that allow the affiliates to offer vending food service and vending services to consumers. (Affidavit of Mr. Jeffrey S. Whitacre, President and CEO of USConnect, Dkt. No. 8-5, ("Aff. of Whitacre") at ¶ 3).

Sprout is a New Jersey based corporation that provides essential services for cashless transactions such as back-end software and information technology (IT) functionalities support. In addition, Sprout provides account support features to process payment and loyalty card transactions when a registered card is used at a vending machine of kiosk. (*See* Declaration of Mr. Jim English, Dkt. No. 9-2 ("Decl. of English") at ¶ 2).

On April 1, 2013, Sprout and USConnect entered into a two-year Sprout Service and License Agreement ("Service Agreement") that required Sprout to license its software and services to USConnect for use in vending machines, food services and kiosks. (*See* Service Agreement at p. 1; Dkt. No. 8-6; *also see* Decl. of English at ¶ 6). Under the Service Agreement, Sprout developed the initial account services, payment gateway, and customer support server functions and database protocols necessary to support USConnect's affiliates. (*See* Aff. of Whitacre at ¶ 6). The Sprout software and services included reporting, payment, loyalty, and a promotional system (collectively the "Sprout System"). For the two-year term, USConnect was permitted to use the Sprout System to increase the number of operators and transactions using pre-coded payment cards. (*See* Decl. of English at ¶ 7).

The pre-coded payment cards, issued to USConnect through Heartland Payment Systems, were registered by end consumers as Sprout One cards. The end consumers had to accept terms of a service prior to using their cards. The terms of service indicated in-part,

> "The USConnect Card is a prepaid card that can be used at participating merchants subject to the terms of this agreement. […] Treat as cash. […] The Card allows you to load funds onto the Card through loading from a credit card or other funding source. Once your Card is loaded, you can make purchases at locations that accept the Card, as long as the available balance on your Card equals or exceeds the amount of your withdrawals plus applicable fees."

(*see* Decl. of English at ¶¶ 9, 25; Terms of Service, Exhibit 3, Dkt. No. 9-2). Sprout permitted these pre-coded payment cards to be rebranded by USConnect, but the coded account information on the card directed the transactions through the Sprout System. (*See* Decl. of English at ¶ 25). Sprout established a network of operators in twenty (20) regions and over 100,000 active users. (*Id.* at ¶ 9). The pre-coded payment cards enabled cardholders or consumers to transact cashless payment for purchases from vending machines connected to the Sprout System. These cards have a unique "OAN number" that can be recognized by a vending machine card reader, which would direct the transaction through the Sprout System. Essentially, these cards are keyed to the Sprout System. Additionally, the cards provide a toll-free number that connects Sprout's customer service department to troubleshoot technical difficulties. (*Id.* at 26-27).

Under the Service Agreement, Sprout had access to USConnect's proprietary business information, which included USConnect's know-how, service pricing information, customer proposals, historical costs of service, sales data, customer lists, key person relationships, and anticipated service upgrades and price increases. (*See* Aff. of Whitacre at ¶ 9). USConnect played no role in the design or technical development of the intellectual property that it licensed from Sprout. And, during the two-year term of the Service Agreement, Sprout allegedly made enhancements to the software and technologies. (*See* Decl. of English at ¶ 11).

Pursuant to the "Ownership of Technical Development" section of the Service Agreement, the parties agreed as follows—

"In the absence of a joint development agreement between the parties, Sprout will own, and [USConnect] will assign to Sprout, all rights, title, and interest in and to all technologies created, made, conceived, reduced to practice or authored jointly by Sprout and [USConnect] in connection with the performance of this Agreement. Any future solutions or technologies developed by Sprout are not subject to the terms of this agreement. [USConnect] has the right to request a joint development agreement between the parties should the [USConnect] contemplate development

4

of any technologies and that agreement would dictate the ownership of such technologies."

(*See* Service Agreement at p. 7; *also see* Decl. of English at ¶ 12). And, pursuant to the "Sprout Software" section of the Service Agreement, the parties agreed as follows—

> "Sprout retains all right, title and interest in and to the Sprout System and Sprout Software and the associated intellectual property rights. The Sprout System and Sprout Software are not being sold by Sprout to [USConnect]."

> [USConnect] acknowledges and agrees that all copyrights, trademarks, service marks, trade secrets and other proprietary rights of any kind, in or to the Sprout System and Sprout Software are owned by, and shall remain the property of Sprout."

(*See* Service Agreement at p. 6; *also see* Decl. of English at ¶ 15). All the pre-existing program concepts of the Sprout One Card, which included stored value, loyalty, designing a charity, and promotions, were carried over and adopted by USConnect as a licensee of Sprout. (*See* Decl. of English at ¶ 18). In consideration for Sprout's services, USConnect paid a fixed monthly service fee of $25,000. (*See* Service Agreement at p. 8).

USConnect alleges that Sprout has interfered with contractual relationships with its existing clients, such as Beco and USA Technologies, by offering to provide competing services. USConnect alleges that this solicitation to its clients occurred immediately after Sprout interrupted the payment gateway services which had been provided for its client USA Technologies. (Aff. of Whitacre at ¶¶ 15, 16). By using USConnect's trade secrets and confidential information, for example, USConnect's know-how, service pricing information, customer proposals, sales data and customer lists, USConnect alleges that Sprout is developing a competing business program to solicit its customers and affiliates. Thereby, improperly competing with USConnect, which in turn is causing USConnect and its affiliates' economic loss, damage to business reputation and goodwill. (*Id.* at ¶¶ 19, 20, 22).

In opposition, Sprout alleges that without Sprout's consent USConnect—(i) has replicated and converted the previously-licensed Sprout System, and (ii) is using its later developed, improved Sprout System; causing Sprout irreparable harm. (*See* Decl. of English at ¶ 13).

For example, Sprout alleges that USConnect has misappropriated the following features developed by Sprout—(i) APIs and (ii) communication instructions between the vending machine card readers and the Sprout System. The APIs are proprietary communication protocols that enable USConnect to utilize any hardware and payment system programs that its customers used; thereby processing cashless payments. APIs are only shared with the licensees. (*See* Decl. of English at ¶¶ 24, 25).

Whereas, communications between the vending machine card readers and the Sprout System are achieved by using pre-coded payment cards, which have the unique "OAN number." These pre-coded payment cards are still being used by the cardholders. Sprout further alleges that USConnect has "put in place technology and communicated instructions to its integrations, which circumvents most of the vending machine card readers from directing the transaction to the Sprout System." Thereby, redirecting transactions away from the Sprout System to a USConnect server. (*See* Decl. of English at ¶¶ 27, 28). In a nutshell, Sprout alleges that USConnect has replicated the licensed Sprout System, which includes the Sprout Software, and made unauthorized copies of the licensed software, know-how, and later developed technologies for its benefit. (*See* Decl. of English at ¶ 29).

The Service Agreement continued in effect through 2016, when USConnect began to transition some services to a new service provider. At this point, Sprout implemented a new payment gateway system for USConnect, replacing the aspect of the payment gateway services previously provided by the Sprout System. (Aff. of Whitacre at ¶ 11). The parties agreed to

negotiate a new proposed new agreement, which included provisions related to a new Sprout payment gateway system. To facilitate transition, on March 26, 2016, the parties executed a letter of intent affirming and extending the continued effect of the Service Agreement until a new agreement took effect. The March 26, 2016 letter, signed by James English, President of Sprout, and Jeffrey Whitacre, President & CEO of USConnect, recites, in-part,

> This letter is to state our mutual intention to complete a new contractual arrangement between USCONNECT, LLC ("USConnect") and SPROUT RETAIL, INC. ("Sprout") for the provision of Sprout's cashless "Gateway" services, ByteVampire, and to confirm our agreement with respect to the "Gateway", "Account" and "User" services to be provided by Sprout during a transition from our Service and License Agreement of April 1st 2013, as amended (the "Old Agreement").

(*see* Exhibit C; Dkt. No. 6-10). However, the new agreement never came to fruition as there was no meeting of the minds. (*See* Decl. of English at ¶ 21; Aff. of Whitacre at ¶¶ 12, 14). In late 2016, USConnect allegedly did not pay Sprout's invoices for the services it rendered during the negotiation period of the execution of the new agreement. (*See* Decl. of English at ¶ 22).

On January 4, 2017, USConnect sued Sprout in North Carolina for claims arising from the parties' relationship under the Service Agreement. In the complaint of the NC Action, USConnect alleged the following three claims—declaratory judgment of intellectual property rights; breach of the Service Agreement by Sprout; and misappropriation of USConnect's trade secrets by Sprout. Thereafter, USConnect filed a motion for preliminary injunction in the NC Action that has not yet been resolved. (*See* Dkt. No. 6-5).

On January 8, 2017, Sprout filed this federal action. In the federal action, Sprout alleges, *inter alia*—payment of outstanding debts by USConnect; award for compensatory and special damages; and breach of the Service Agreement by USConnect. On February 21, 2017, Sprout filed a motion for preliminary injunction under Fed. R. Civ. P. 65 in the federal action. (*See* Dkt. No. 9).

## LEGAL STANDARDS

### *Fed. R. Civ. P. 12(b)(1)*

Pursuant to the Federal Rules of Civil Procedure, Rule 12(b)(1), a claim can be dismissed for "lack of jurisdiction over the subject matter." This motion to dismiss may be asserted at any time in a case. *In re Kaiser Group Int'l, Inc.*, 399 F.3d 558, 565 (3d Cir. 2005). In a motion to dismiss based on subject matter jurisdiction, "the standard . . . is much more demanding [than the standard under 12(b)(6)]." "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

If the defendant's attack is facial, the court may take all allegations in the complaint as true and Amay dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction." *Liu v. Gonzales*, 2007 U.S. Dist. LEXIS 74611, at *7 (D.N.J. Oct. 5, 2007). The standard of review differs substantially from that under Rule 12(b)(6), however, when the challenge is factual. Then, there is no presumption of truthfulness to a plaintiff's claims in the complaint. *RLR Invs., LLC v. Town of Kearny*, No. 06-cv-4257, 2007 U.S. Dist. LEXIS 44703, at *8 (D.N.J. June 20, 2007) (citations omitted).

Thus, consideration of the motion does not have to be limited B conflicting evidence may be considered so that the court can decide factual issues that may bear on its jurisdiction. *Id.* Furthermore, "[w]hen resolving a factual challenge, the court may consult materials outside the pleadings, and the burden of proving jurisdiction rests with the plaintiff." *Med. Soc'y of N.J. v. Herr*, 191 F. Supp. 2d 574, 578 (D.N.J. 2002) (citing *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000)). "However, "[w]here an attack on jurisdiction implicates the merits of plaintiff's [F]ederal cause of action, the district court's role in judging the facts may be more limited." *RLR Invs., LLC*, 2007 U.S. Dist. LEXIS 44703, at *9 (internal citations omitted).

*Fed. R. Civ. P. 12(b)(2)*

Pursuant to Fed. R. Civ. P. 12(b)(2), a complaint may be dismissed for lack of personal jurisdiction. "If an issue is raised as to whether a court lacks personal jurisdiction over a defendant, the plaintiff bears the burden of showing that personal jurisdiction exists." *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2007). "To meet this burden, the plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ("specific jurisdiction") or that the defendant has 'continuous and systematic' contacts with the forum state ("general jurisdiction")." *Provident Nat'l Bank v. CA Fed. Sav. & Loan Assn.*, 819 F.2d 434, 437 (3d Cir. 1987) (citations omitted).

Under Fed. R. Civ. P. 4(k), "a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Id.* at 296 (quoting *Provident Nat'l Bank*, 819 F.2d at 437; Fed. R. Civ. P. 4(k)(1)(A)). Pursuant to the New Jersey long-arm rule, N.J. Court R. 4:4-4(c), personal jurisdiction in New Jersey "extends to the limits of the Fourteenth Amendment Due Process protection." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145 (3d Cir. 1992). Therefore, this Court is "constrained, under New Jersey's long-arm rule, only by the 'traditional notions of fair play and substantial justice,' inhering in the Due Process Clause of the Constitution." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Those notions require that a defendant have certain minimum contacts with the forum state based upon the defendant's own purposeful availment "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Unilateral activity on the part of the plaintiff will not cause the defendant to be subject to personal jurisdiction in that forum. *Id.*

*Fed. R. Civ. P. 65*

The standard for a preliminary injunction requires the plaintiff to establish the following four elements: 1) the plaintiff is likely to succeed on the merits; 2) denying the injunction will result in irreparable harm to the plaintiff; 3) granting the injunction will not result in greater harm to the defendant; and 4) the injunction is in the public interest. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3d Cir. 2002). Irreparable harm is shown if "a plaintiff demonstrates a significant risk that he ... will experience significant harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484-85 (3d Cir.2000). The loss of income alone does not constitute irreparable harm. *Id.* at 485.

Courts have noted that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed. 1995)).

Additionally, the Supreme Court has held that "[a] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 375 (U.S. 2008). Furthermore, a preliminary injunction may not be issued where there are disputed issues of fact. *Gruntal & Co. v. Steinberg*, 843 F. Supp. 1, 15 (D.N.J. 1994). It is important to keep this high standard in mind in the analysis of each element of the test for granting an injunction.

## ANALYSIS

### *I. Personal Jurisdiction*

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant. Second, the court must determine whether the exercise of jurisdiction violates Due Process of the Fourteenth Amendment. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998); *Vetrotex Certaineed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 150 (3d Cir. 1996). In this forum, the inquiry is collapsed into a single step, because New Jerseys long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process as defined under the Constitution of the United States. As such, federal law defines the parameters of this Courts in personam jurisdiction. *IMO Indus., Inc.*, 155 F.3d at 259.

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). It is the burden of the plaintiff to prove that the defendant has purposefully availed himself to the forum state. *Burke v. Ouartev*, 969 F. Supp. 921, 924 (D.N.J. 1997).

To prove that the defendant has purposefully availed itself of that state, a plaintiff may rely upon a defendant's specific contacts with the forum state. The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiffs. *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 and n.9 (3d Cir. 1984). Personal jurisdiction pursuant to such contacts is known as specific jurisdiction.

Specific jurisdiction is invoked when a claim is related to or arises of out the defendant's contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *Dollar Sav. Bank v. First Sec. Bank of Utah*, 746 F.2d 208, 211 (3d Cir. 1984). A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citations omitted).

What constitutes minimum contacts varies with the "quality and nature of defendant's activity." *Hanson*, 357 U.S. at 253. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler*, 465 U.S. 770, 770 (1984). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. *United States Golf Ass'n v. United States Amateur Golf Ass'n,* 690 F.Supp. 317, 320 (D.N.J. 1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. *Helicopteros Nacionales de Colombia*, 466 U.S. at 414; *Hanson*, 357 U.S. at 253.

Assuming minimum contacts have been established, a court may inquire whether Athe assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)); *see also Pennzoil Prod. Co. v. Colelli & Assoc. Inc.*, 149 F.3d 197, 201 (3d Cir.1998). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. *World-Wide Volkswagen. Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

To determine reasonableness, a court considers the following factors: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiffs' interest in obtaining

convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies. *Id.* Only in "rare cases [do the] "minimum requirements inherent in the concept of 'fair play and substantial justice' ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 116 (1987).

Although in some contexts, a single contact may be enough to permit a finding of jurisdiction, standing alone, a contract with an out-of-state party does not automatically establish minimum contacts. *Burger King,* 471 U.S. at 478; *Sunbelt,* 5 F.3d at 32. Rather, the court must examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendant purposefully established minimum contacts with the forum. *Burger King, 471* U.S. at 479.

Here, the Court finds that USConnect has the sufficient minimum contacts with the State of New Jersey for it to have reasonably anticipated being haled into court in this jurisdiction. Regarding the "prior negotiations" which led to the Service Agreement as executed on April 1, 2013, Sprout indicates that Jeff Whitacre, CEO of USConnect, signed a 2011 Food Express license, which had a New Jersey choice of law provision; and prior to the 2013 Service Agreement, Sprout did business with an affiliated company of USConnect, which are commonly owned. (*See* Pl.'s Br. at 22-23; Dkt. No. 9-3; Pl.'s Br. at 1; Dkt. No. 10 (citing Decl. of English at ¶¶ 7-8)). The prior relationship included negotiations, meetings and payments. (*See* Pl.'s Br. at 2; Dkt. No. 10).

During the term of the Service Agreement, USConnect had the continuing obligation of over two-years, which was later extended to a third year term pursuant to a letter of intent, to pay the fixed monthly fee of $25,000 to Sprout in exchange for the licensing of the Sprout System.

Moreover, during the term of the Service Agreement, USConnect licensed from Sprout its Sprout System, which included the Sprout Software. In order for USConnect to process payments and cashless card transactions on vending machines, it accessed the servers, and in turn the Sprout Software, which are located in the State of New Jersey. (*See* Pl.'s Br. at 22-23; Dkt. No. 9-3). The continuing payment obligations and having at least two (2) vendors in the State of New Jersey (*see* Def.'s Br. at 24; Dkt. No. 8-3), indicates USConnect's long-term commitment with the state residents of New Jersey to establish minimum contacts. *Burger King*, 471 U.S. at 476.

Next, with regards to "future consequences," after the two-year term of the 2013 Service Agreement expired, USConnect transmitted to Sprout a non-binding letter of intent. The letter of intent indicated that the parties would engage in further negotiations and agreements, and extend the effect of the Service Agreement through the year 2016. (*See* Pl.'s Br. at 22-23; Dkt. No. 9-3). The letter of intent included language directed towards USConnect's continued licensing of the Sprout System to process cashless payments.

As such, the Court finds that the Service Agreement created a commitment whereby USConnect would share its proprietary information and trade secrets in exchange for a license to use Sprout's software, system and servers. Having established such a relationship, the Court finds that USConnect purposely availed itself to this Court's jurisdiction and anticipated being haled in this court for claims related to or arising out of defendant's contacts with the State of New Jersey.

## II. *First-Filed Rule*

In its moving papers, USConnect argues that this federal action should be dismissed under the first-filed rule because the NC Action was filed four (4) days before the federal action, which encompasses the exact same legal and factual issues underlying Sprout's claims in this action. For example, the issues are—(i) whether Sprout or USConnect breached the terms of the Service

Agreement, (ii) whether Sprout or USConnect misappropriated the other's trade secrets and confidential information, and (iii) whether Sprout owns Intellectual Property ("IP") rights in and exclusive control over the Sprout System. (*See* Def.'s Br. at 13-14; Dkt. No. 8-3). In addition, USConnect alleges that all of the claims in the federal action are in fact compulsory counterclaims in the NC Action, and as such should be dismissed from the federal action.

In response, Sprout argues that USConnect's application of the first-filed rule is misplaced because this rule does not apply between federal and state court cases. In support, Sprout cites to multiple cases from this district that suggest that first-filed rule applies between federal courts of equal rank rather than between concurrent matters in federal and state courts. (*See* Pl.'s Br. at 5; Dkt. No. 10 (*citing McGowan Builders, Inc. v. A. Zahner Co.*, 2014 WL 1343091, at \*2 (D.N.J. 2014)).

Generally, the first-filed rule provides that "where there are parallel proceedings in different federal courts, the first court in which jurisdiction attaches has priority to consider the case." *FMC Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, 737 (E.D.Pa. 2005). This approach "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988) (citation omitted). The first-filed rule's "letter and spirit ... are grounded on equitable principles," and its "primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *Id.* at 977 (citations omitted).

Here, the Court finds that the first-filed rule does not apply to the instant case. Granted, the underlying factual and legal issues in the federal action are identical as the ones raised in the NC Action; and the parties in both cases are the same. However, the first action, the NC Action, is filed in the State Court of North Carolina, and not in a federal District Court. If the previous action

was filed in the U.S. District Court for the District of North Carolina, instead of the State Court, for example, then the first-filed rule would apply in the instant case as a stay or abstention in the instant case would encourage sound judicial administration and promote comity among federal courts of equal rank. However, because the previous case was filed in the state court, the first-filed rule does not apply in the federal action. *Inter City Tire and Auto Center, Inc. v. Michelin North America, Inc.*, 2013 WL 5567564, at *2 (D.N.J. 2013).

### III.     Colorado River Abstention Doctrine

Federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976). Under the *Colorado River* abstention doctrine, a federal court may abstain when there is a "parallel" concurrent proceeding pending in state court. *Colorado River* 424 U.S. at 813. A federal court should invoke *Colorado River* abstention only in "exceptional circumstances." The federal court's task "is not to find some substantial reason for the *exercise* of federal jurisdiction," but to determine whether exceptional circumstances "justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983). *Colorado River* abstention is not based on weighty consideration of federal-state regulations, but it is designed to promote "wise judicial administration." *Colorado River*, 424 U.S. at 817-818.

The threshold issue for *Colorado River* abstention is whether the two actions are "parallel," meaning the state and federal proceedings involve the same parties and "substantially identical claims [raising] nearly identical allegations and issues." If the proceedings are parallel, then the court balances a set of factors. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.,* 571 F.3d 299, 307 (3d Cir.2009).

The Supreme Court in *Colorado River* identified four (4) factors to be considered in determining whether exceptional circumstances exist—(i) the problems created by two courts exercising concurrent jurisdiction over a res; (ii) the relative inconvenience of the federal forum; (iii) the goal of avoiding piecemeal litigation; and (iv) the order in which the state and federal forums obtained jurisdiction. *Id.* Thereafter, the Supreme Court added two additional factors in *Moses* that are to be assessed in deciding whether to surrender jurisdiction. Namely—(v) whether federal or state law will control decision of the issues pending in the federal case; and (vi) whether the state court will protect the interests of the parties. *Fumero-Vidal v. First Fed. Savings Bank*, 788 F.Sup. 1275, 1284 (D.Puerto Rico, 1992); *also see Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.,* 571 F.3d 299, 308 (3d Cir.2009).

The aforementioned factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a "mechanical checklist." *Moses*, 460 U.S. at 16. These factors are relevant to the decision as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. *Id.*

## A. The Federal and State Court Proceedings are parallel.

Here the NC Action and the federal action are parallel proceedings. Both cases involve the same parties and nearly identical claims and issues. The NC Action was filed on January 4, 2017, and included claims directed to whether Sprout breached the terms of the Service Agreement, whether Sprout misappropriated USConnect's trade secrets and confidential information, and whether Sprout owns IP rights in and exclusive control over the Sprout System or other IP.

This federal action was filed on January 8, 2017, and includes claims directed to whether USConnect breached the terms of the Service Agreement, whether USConnect misappropriated Sprout's trade secrets and confidential information, and whether Sprout owns IP rights in and

exclusive control over the Sprout System or other IP. The Service Agreement being the same in both the federal action and the NC Action.

In short, the Court finds that, at this stage of the litigation, the factual and legal issues involved in this federal action overlap with the factual and legal issues pending before the NC Action. As such, the Court finds that because same parties and substantially identical claims and allegations are raised the federal action and the NC Action, the state and federal actions are parallel.

## B. The Six *Colorado River* Abstention Factors Weigh towards Retaining Jurisdiction.

The first factor to be considered is which court first assumed jurisdiction over the property in dispute. The first factor is irrelevant in the present matter for purposes of determining abstention because the federal action is not in *rem*. As such, the first factor does not weigh either for or against the surrender of jurisdiction.

For the second factor, the Court must determine whether to apply *Colorado River* abstention is an inconvenience of federal forum. Here, USConnect argues that the federal forum in the state of New Jersey would be inconvenient for it to litigate the federal action because it is based in the State of North Carolina. It lacks the minimum contacts in the State of New Jersey as it does not have any offices, agents or employees located in the State of New Jersey conducting business on behalf of USConnect. And, further, being a small company of few employees, it does not have the resources of a big corporation, for example, to litigate the federal action in an out-of-state federal court. In contrast, Sprout argues that because USConnect has specific minimum contacts with the State of New Jersey that give rise to the claims at issue in the federal action, it availed itself and reasonably anticipated being haled into court in this state.

As noted under the personal jurisdiction section, the Court finds that this Court has specific jurisdiction over USConnect because the Service Agreement between the parties created a

continuing commitment from USConnect to share its proprietary information and trade secrets in exchange for a license to use Sprout System and software. The Sprout System and software are located in the State of New Jersey. Accordingly, the Court finds that, because USConnect availed itself to the benefits and protections of the State of New Jersey, the federal forum is not inconvenient to USConnect.

As such, the second factor weighs in favor of this Court not surrendering jurisdiction under the *Colorado River* abstention doctrine.

The third factor to be considered is the desirability of avoiding piecemeal litigation. Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reading different results. *American Int'l Underwriters v. Continental Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir.1988) (*citing Ryder Truck Rental, Inc. v. Acton Foodservices Corp.*, 554 F.Supp. 277 (C.D.Cal. 1983) ("district court abstains because '[e]xercising federal jurisdiction in the federal action would not only require duplication of time and effort on the part of the litigants and the Court, but would also create the possibility of inconsistent results.").

Further, this Circuit has held that mere possibility of piecemeal litigation does not justify *Colorado River* abstention. Rather, there must be "a strongly articulated *congressional policy* against piecemeal litigation in the specific context of the case under review." *Ryan v. Johnson*, 115 F.3d 193, 197 (3d Cir.1997) (*citing Colorado River*, 424 U.S. at 819 ("The clear federal policy evidenced by [the McCarran Amendment] is the avoidance of piecemeal adjudication of water rights in a river system.")).

In *Ryan*, the Third Circuit noted that absent a strongly articulated congressional policy, almost every state-federal litigation would satisfy *Colorado River's* "piecemeal adjudication" test.

A result "we cannot presume either the Supreme Court or this court to have intended." *Ryan*, 115

F.3d at 198. The Court in *Ryan* further stated,

> "[…] *Colorado River's* "piecemeal adjudication" test, the test becomes so broad
> that it swallows up the century-old principle expressed in *University of Maryland,*
> *Colorado River, McClellan* and *Sherwood* that "the pendency of an action in the
> state court is no bar to proceedings concerning the same matter in the Federal court
> having jurisdiction...." *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246. If this
> were the law, it is difficult to conceive of *any* parallel state litigation that would not
> satisfy the "piecemeal adjudication" factor and militate in favor of *Colorado River*
> abstention. If that is true, then the "virtually unflagging obligation of the federal
> courts to exercise the jurisdiction given them [ ]" recognized in *Colorado River,*
> 424 U.S. at 817, 96 S.Ct. at 1246, and reiterated in *Cone* would effectively be
> eviscerated, a result we cannot presume either the Supreme Court or this court to
> have intended."

*Id.*

Here, the case in the state court of North Carolina, filed on January 4, 2017, is still in its

infancy stage. For example, in the NC Action, USConnect has filed a motion for preliminary

injunction, both parties have served written discovery requests on each other, and the parties are

working on a case management report and discovery plan which includes a briefing schedule for

USConnect's motion for preliminary injunction. (*See* Def.'s Br. at 9; Dkt. No. 8-3). There has been

no ruling on the preliminary injunction, and there have been no other dispositive motions filed by

Sprout such as motion to dismiss.

Granted, both cases revolve around the alleged breach of the Service Agreement between

the parties, and Sprout's claims in the federal action are potentially counterclaims in the NC

Actions. However, there has been no adjudication on any of these issues, or ruling on any other

dispositive motions in the NC Action. Additionally, Sprout alleges a claim under the Computer

Fraud and Abuse Act against USConnect in the federal action, which is not alleged in the NC

Action. Accordingly, the Court does not find that there would be any inconsistent results or a duplication of time and effort by the litigants and the Courts in litigating this federal action.

Further, there is no evidence of any federal policy in the federal action that would favor abstention. *Spring City Corp. v. American Bldgs. Co.,* 193 F.3d 165, 172 (3d Cir. 1999) (holding that abstention is only warranted when there is a strong federal policy against such litigation). USConnect has not cited any such federal policy.

As such, the third factor weighs in favor of this Court not surrendering jurisdiction under the *Colorado River* abstention doctrine.

The fourth factor to consider is the order in which jurisdiction was obtained and exercised. This factor must be applied in a pragmatic, flexible manner, so that priority is not measured exclusively in terms of which complaint was filed first, but rather in terms of how much progress was actually made in the state and federal actions. *American Int'l Underwriters*, 843 F.2d at 1258 (9th Cir.1988) (*citing Moses*, 460 U.S. at 21).

The Court notes that Sprout did not remove the NC Action to federal court under 28 U.S.C. § 1446. In *Fumero-Vidal*, the court noted that "circumvention of the policy against plaintiff removal […] is usually discussed [] in connection with factor four, i.e., order of filing and relative progress of the parallel suits […]." *Fumero-Vidal*, 788 F.Sup. at 1283. The court further noted that "circumvention of removal policy is not a factor favoring dismissal unless both parallel cases continue in existence, […] and unless plaintiffs in a later federal suit could have removed the state or Commonwealth litigation to the federal court, had they chosen to do so." *Id.*

Here, facts presented in *Fumero-Vidal* are similar to the instant case. Sprout is pursuing its counterclaim in the NC Action after filing its complaint here, thereby having both parallel cases continue in existence. Sprout could have removed the NC Action to the U.S. District Court for the

District of North Carolina by filing a notice of removal pursuant to 28 U.S.C. § 1446. However, Sprout failed to do so.

As such, the fourth factor weighs in favor of this Court surrendering jurisdiction under the *Colorado River* abstention doctrine. However, this is one of the six factors under *Colorado River*. And, although, in my mind, a lack of removal by plaintiff is of great significance and consequence than the other factors, *Moses* does not dictate the same. *See Moses*, 460 U.S. at 16.

The fifth factor to consider is whether the federal or state law control the decision of the issues in the federal action. Granted, state law controls this matter as the Service Agreement is governed by and is to be construed in accordance with the laws of the State of North Carolina. (*See* Service Agreement at p. 12). As such, this factor weighs marginally in favor of abstention.

However, federal district courts routinely decide breach of contract claims in diversity cases which is the situation presented in the instant case. *Ryan*, 115 F.3d at 200 (state law factor did not support abstention in an action based on negligence, "an area ... in which federal courts are called upon routinely to predict state law.").

As such, the fifth factor weighs in favor of this Court not surrendering jurisdiction under the *Colorado River* abstention doctrine.

Lastly, the sixth factor to consider is whether state court will protect the interest of the parties. The Court notes that the state court in the NC Action is capable of adjudicating on the issues regarding the Service Agreement that are subject of litigation in the NC Action such that interests of both parties would be protected. As such, the sixth factor weighs in favor of this Court surrendering jurisdiction under the *Colorado River* abstention doctrine.

In a nutshell, the Court finds that two of the aforementioned factors, order in which the jurisdiction was obtained (fourth factor) and whether the state court will adequately protect the

interests of the parties (sixth factor), favor this Court surrendering its jurisdiction under the *Colorado River* abstention. However, three of the aforementioned factors—inconvenience of federal forum (second factor), avoiding piecemeal litigation (third factor) and whether federal or state law controls (fifth factor)—favor this Court in not surrendering its jurisdiction under the *Colorado River* abstention.

Because the aforementioned factors are to be applied in a pragmatic and flexible way, as part of a balancing process; and because *Colorado River* abstention is to be invoked by federal court only in "exceptional circumstances;" and because federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," the Court determines that it will not surrender jurisdiction under the *Colorado River* abstention doctrine. As such, the Court retains jurisdiction over the federal action. *See Colorado River*, 424 U.S. at 817—818.

## IV. Preliminary Injunction

Sprout asserts that preliminary injunction is warranted in this matter because USConnect is misappropriating and misusing its—(i) pre-coded payment cards, (ii) the APIs and related payment protocols, and (iii) software and system. (*See* Pl.'s Br. at 29; Dkt. No. 9-3). That is, Sprout alleges that USConnect is misappropriating its trade secrets, which is damaging its reputation, brand and services, and thereby eliminating any commercial advantage that Sprout may have. (*See Id.* at 30; Pl.'s Reply Br. at 2; Dkt. No. 19). Sprout notes that USConnect had a license to the aforementioned features provided by Sprout under the Service Agreement; however, since the Service Agreement is terminated, any further use of these features is unwarranted and a breach of the Service Agreement. (*See* Pl.'s Reply Br. at 5; Dkt. No. 19).

In response, USConnect argues that a preliminary injunction should not be granted because—(i) Sprout cannot establish that the Service Agreement is expired, and absent such a

showing, it still has a license to the aforementioned trade secrets under the Service Agreement (*see* Def.'s Br. at 13, 17; Dkt. No. 18); (ii) USConnect's current system is substantially different from the Sprout APIs because it is using its own system and no longer using the Sprout System (*see Id.* at 19); (iii) USConnect has issued new cards, which are different from the pre-coded payment cards issued through the Heartland Payment Systems, because Sprout refused to continue to offer troubleshooting services to its customers (*see Id.* at 21); and (iv) USConnect has stopped the use of the Sprout System (*see Id.* at 24; *citing* Aff. of Whitacre at ¶ 14).

Additionally, relying on the "Ownership of Technical Developments" section of the Service Agreement, Sprout asks this Court to issue a preliminary injunction on the later developed technologies that are allegedly being used by USConnect, which were "jointly" developed by Sprout and USConnect. The "Ownership of Technical Developments" section states, in-part,

> "In the absence of a joint development agreement between the parties, Sprout will own, and [USConnect] will assign to Sprout, all rights, title, and interest in and to all technologies created, made, conceived, reduced to practice or authored jointly by Sprout and [USConnect] in connection with the performance of this Agreement. Any future solutions or technologies developed by Sprout are not subject to the terms of this agreement. [USConnect] has the right to request a joint development agreement between the parties should [] [USConnect] contemplate development of any technologies and that agreement would dictate the ownership of such technologies."

In interpreting the aforementioned language, Sprout asserts that it owns "all" technologies, whether created, or made, or conceived, "or" reduced to practice "or authored jointly." (*See* Pl.'s Br. at 7; Dkt. No. 19). Whereas, USConnect argues that provision 'jointly' only applies where Sprout and USConnect have developed "jointly;" and as such, Sprout is not entitled to ownership of "all" technologies that later developed by USConnect. (*See* Def.'s Br. at 23; Dkt. No. 18).

The Court interprets this section to mean that Sprout owns all the technologies that are jointly authored between Sprout and USConnect. This section begins with "[i]n the absence of a

joint development agreement between the parties," Sprout has complete ownership rights in the technologies that are authored jointly or collaborated between Sprout and USConnect. That is, USConnect's interest in a jointly ventured technology with Sprout can be altered or modified if there is a joint development agreement in place. Absent a joint development agreement, the ownership interests in technologies developed jointly by Sprout and USConnect belong to Sprout.

Such an interpretation is sound because the aforementioned section further states, "[USConnect] has the right to request a joint development agreement between the parties should the [USConnect] contemplate development of any technologies and that agreement would dictate the ownership of such technologies." In other words, if USConnect individually develops a technology, without any collaboration from Sprout, then it may request a joint development agreement with Sprout to define its ownership interests in the developed technology. However, for Sprout to claim ownership interest in a later developed technology by USConnect, Sprout would need to jointly author or collaborate with USConnect to claim ownership rights in such technology.

As such, the Court notes that Sprout has ownership interests in later developed technologies by USConnect as long as these later developed technologies were jointly authored or collaborated with Sprout. Sprout alleges in its papers that it has ownership interests on USConnect's later developed technologies (*see* Pl.'s Br. at 27-29; Dkt. No. 9-3); however, it fails to show whether it has jointly authored or collaborated in these later developed technologies.

Next, with respect to Sprout's claim that USConnect is misappropriating its trade secrets, the Court notes that a prerequisite to the issuance of a preliminary injunction is that the moving party must show a clear right to relief. That is, there must be no disputed issues of fact as a district court cannot resolve a motion for a preliminary injunction under Rule 65 that depends upon the resolution of disputes issues of fact. *Arrowpoint Capital Corp. v. Arrowpoint Asset Management,*

*LLC*, 793 F.3d 313, 323 (3d Cir.2015) (*citing Prof'l Plan Exam'rs of N.J., Inc. v. Lefante,* 750 F.2d 282, 288 (3d Cir.1984) ("a district court cannot resolve a motion for a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing")).

In the instant case, there is no dispute that USConnect and Sprout are essentially competitors of each other as they are allegedly using each other's trade secrets to conduct business and attract new or retain existing customers. Since they are competing in the same market place, providing essentially the same services to their customers, the Court finds that Sprout faces irreparable harm as to its pre-coded payment cards. The pre-coded payment cards contain the toll-free number that connects Sprout's customer service department to troubleshoot technical difficulties faced by USConnect's customers or cardholders. For Sprout to continue to dedicate resources to provide support for technical difficulties encountered by the cardholders demonstrates potential harm which cannot be redressed by a legal remedy. *Roman Chariot, LLC v. JMRL Sales & Service, Inc.*, 2006 WL 4483165, at *5 (D.N.J. 2006) (*citing ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). As such, the Court enjoins USConnect from the continued use of the pre-coded payment cards issued by the Heartland Payment System under the Service Agreement.

Nevertheless, there are issues that are determinative of resolution of Sprout's preliminary injunction. These issues are—(i) Sprout's APIs and related payment protocols, and (ii) Sprout's software and system. USConnect alleges that it has a new system that is substantially different from the Sprout System and Sprout software, and as such it is no longer using Sprout's APIs and the Sprout System and software. A factual hearing would be required to determine these disputed factual issues. *Arrowpoint Capital Corp.*, 793 F.3d at 323.

Accordingly, the Court finds that without the benefit of an evidentiary hearing, the Court cannot resolve a motion for a preliminary injunction that depends upon the resolution of the aforementioned disputed issues of fact.

**ORDER**

IT IS on this 10th day of April, 2017,

**ORDERED** that Defendant's motion to dismiss Plaintiff's second-filed complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(2) (*see* Dkt. No. 6) is rendered moot;

**ORDERED** that Defendant's motion to dismiss Plaintiff's amended second-filed complaint (*see* Dkt. No. 8) Fed. R. Civ. P. 12(b)(1) and 12(b)(2) is DENIED;

**ORDERED** that Plaintiff's motion for preliminary injunction under Fed. R. Civ. P. 65 (*see* Dkt. No. 9) is GRANTED IN-PART and DENIED IN-PART;

**ORDERED** that USConnect is enjoined from using Sprout's pre-coded payment cards issued by the Heartland Payment Systems under the Service Agreement; and it is further

**ORDERED** that USConnect's motion for leave to file a sur-reply (*see* Dkt. No. 21) is DENIED.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.